# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00258-CV

**Robert Aderhold, Appellant**

**v.**

**John C. Bell, Appellee**

### FROM THE 395TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 23-0083-PO425, THE HONORABLE RYAN D. LARSON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Robert Aderhold appeals the trial court's judgment denying his application for a Family Code protective order against John Bell, who is the long-time live-in boyfriend of Robert's ex-wife, Misti Aderhold.[1]  Robert and Misti are the parents of two children, older K.N.A. (Daughter) and younger K.R.A. (Son), who were, respectively, 17 years old and 14 years old when the final hearing in this suit concluded.  Robert sought the protective order on behalf of Daughter and Son.  On appeal, Robert in two issues contends that the evidence was legally and factually insufficient to support findings against his position under the statutory definition of "family violence" and that we cannot consider the trial court's written findings of fact and conclusions of law because they were untimely.  We affirm.

---

[1]  Because Robert Aderhold and Misti Aderhold share a surname, we will refer to them by their given names to reduce confusion.

## BACKGROUND

Robert's protective-order application turned on the competing testimony of two opposed sets of witnesses, who offered competing retellings of a July 2, 2023 incident that occurred at Misti's home. Present for the incident were Misti, Bell, and Daughter. According to Robert and to a guardian *ad litem* for the children appointed in a separate custody suit between Robert and Misti, the incident was one of family violence committed by Bell against Daughter. But according to Misti and Bell, no family violence occurred.

Daughter and Son used to split time between living with each parent. The night before July 2, 2023, Misti and Bell were away from Misti's home, and Daughter stayed at the home with her boyfriend and two other friends. They purportedly behaved contrary to Misti's home rules. The next day, while Daughter and her boyfriend and friends were away from the home, Misti and Bell returned, and what they saw led Bell to yell at Daughter's boyfriend and friends when she and they returned. When they arrived, Misti waved Bell over to them, and, according to his testimony, he, yelling, "asked the boys and the girl that was with them whose idea it was to leave a bunch of beer cans and tear all the beds up in our house and leave our place looking like there had been a big party and a big soirée at our house" along with leaving behind an empty condom box and a bird that had been killed and deplumed. Daughter became upset that Bell had yelled and cursed at her boyfriend and friends.

The others left, so only Misti, Bell, and Daughter remained at the property, and an argument broke out between Misti and Daughter. Bell watched it, as he had seen Daughter, and Son as well, physically attack Misti before. This argument approached getting physical, and Misti had to shove her way past Daughter to get inside the home. Once all three were inside, there were, according to Misti and Bell, signs that Daughter was about to physically attack Misti again. But

2

before such an attack could happen, and despite recent injuries to his arm, Bell grabbed Daughter, wrapping his arms around her body, to physically move her down the hallway to her room. Bell's and Daughter's actions, mental states, and movements were hotly contested by the competing witness camps at the final hearing in the suit.

No matter whose view is correct, it is undisputed that after Bell had moved Daughter some distance down the hallway, Daughter became free of Bell's arms. She fell. Some time later there was a large bruise on one of her arms near the elbow, and she in the ensuing weeks sought medical treatment, including from a neurologist, for continuing symptoms.

Daughter told Robert her side about what happened during the July 2, 2023 incident, and she has talked with the guardian *ad litem* about it as well. Robert as a result applied for a protective order protecting Daughter and Son from Bell. Robert attached to his application his declaration made under penalty of perjury. In it, he said of the July 2, 2023 incident that Bell "physically assaulted" Daughter; "decided to physically discipline her" because he was upset with her; "picked her up by her arms and squeezed her so tightly that it has left significant bruising"; and "[a]fter picking her up from behind by the arms and manhandling her, . . . physically threw her to the ground," causing her to "hit her elbow."

The final hearing on the application for the protective order was by bench trial spread over four nonconsecutive days in late 2023 and into 2024. The custody suit between Robert and Misti was pending at the same time, and the last day of the trial in the protective-order suit doubled as an evidentiary hearing in the custody suit.

One day not long before that last day of trial, the office of Misti's attorney in the custody suit received a phone call from a person who wanted to impart information about "the Aderhold case." The caller also wanted to remain anonymous. Still, the caller identified herself

3

as the mother of a child who was in school in the same community with Daughter and said that Daughter and Son were playing Misti and Robert off against each other in the custody suit. The caller added that Daughter was arranging matters so that she could continue to live with Robert partly because he lets her buy and consume alcohol. And the caller explained that Daughter was being dishonest about Bell and had told other people so.

So, during the last day of the protective-order trial, Bell's attorney offered as evidence a recording of the anonymous caller's discussion with Misti's attorney's legal assistant who had answered the phone that day. The recording was admitted, and the legal assistant testified about it. Also, Lisa Mattson was called to testify. Back on the first day of the trial, about four months earlier, Robert had testified that Mattson was his girlfriend. On this final day of trial, Mattson testified that she and Robert were "really not back together" and that she had "called the relationship" off shortly "after the recording" of the phone call to Misti's attorney's office "came out because I'm tired of the circus." During questioning by Bell's and Misti's attorneys, it was suggested that Mattson had left the state for some time to dodge service of a subpoena. And it was suggested that given their similar sounding voices, Mattson was the anonymous caller to Misti's attorney's office. She denied it.

After the evidence closed on this final day of trial, the trial court announced that it would deny Robert's application for the protective order. The court soon after rendered its final judgment in the suit, in accordance with the announced ruling.[2] Robert timely requested findings of fact and conclusions of law concerning the denial of his application for the protective order, and

---

[2] Also after the close of the evidence that day, the court announced that in Misti and Robert's custody suit, the court was going to issue a temporary injunction prohibiting Misti from allowing Bell to be in the children's presence and was going to award primary custody of the children to Robert, with phased possession for Misti.

4

he timely filed his notice of past-due findings and conclusions. The trial court sent its written findings and conclusions to the parties but only after the expiration of the deadline in the relevant civil-procedure rule. The trial court made findings in accordance with its denial of the protective order, including that Daughter's statements about the July 2, 2023 incident as those statements had been relayed through the evidence were not trustworthy. The court also found that the anonymous caller was Mattson.

Robert now appeals the judgment denying his protective-order application.

## DISCUSSION

Of Robert's two appellate issues, one is procedural, and the other concerns the merits of the trial court's judgment denying any protective order. *See Hardy v. Hardy*, No. 03-02-00780-CV, 2003 WL 21402002, at *1 (Tex. App.—Austin June 19, 2003, no pet.) (mem. op.) (similarly addressing both procedural and substantive issues). In the procedural issue, he contends that we cannot consider the written findings of fact and conclusions of law issued by the trial court because they were untimely, under Rule of Civil Procedure 297. But we may consider untimely findings and conclusions if an appellant does not show injury in one of two forms: the appellant either was unable to request additional findings or was prevented from properly presenting his appeal. *See id.*; *accord Martinez Jordan v. Pfister*, 593 S.W.3d 810, 823–24 (Tex. App.—El Paso 2019, no pet.); *Robles v. Robles*, 965 S.W.2d 605, 610 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Robert has not shown the requisite harm, so we may consider the untimely findings and conclusions. *See Martinez Jordan*, 593 S.W.3d at 823–24; *Hardy*, 2003 WL 21402002, at *2; *Robles*, 965 S.W.2d at 611. We overrule this issue.

5

On the merits, Robert contends that the evidence was legally and factually insufficient to support the trial court's finding that Bell did not commit family violence. We review evidence-sufficiency issues in these circumstances under the familiar standards. *See B.C. v. Rhodes*, 116 S.W.3d 878, 883–84 (Tex. App.—Austin 2003, no pet.). Because the parties tried this case to the bench, the trial court, as factfinder, is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *McCombs v. State*, No. 03-24-00450-CV, 2025 WL 1910923, at *2 (Tex. App.—Austin July 10, 2025, no pet. h.) (mem. op.). We will not substitute our judgment for the trial court's just because we might reach a different conclusion. *B.C.*, 116 S.W.3d at 884.

For appellants challenging the legal sufficiency of the evidence to support a finding on an issue on which the appellant bore the burden of proof, the appellant must show "that the evidence establishes, as a matter of law, all vital facts in support of the issue." *State v. V.T.*, 575 S.W.3d 921, 924–25 (Tex. App.—Austin 2019, no pet.) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)). We "must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Dow Chem.*, 46 S.W.3d at 241. "If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law." *Id.* The appellant prevails "only if the contrary proposition is conclusively established." *Id.* When considering legal sufficiency, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable factfinder could not disregard it. *See V.T.*, 575 S.W.3d at 925; *Godfrey v. Godfrey*, No. 03-07-00220-CV, 2008 WL 3166328, at *1 (Tex. App.—Austin Aug. 8, 2008, no pet.) (mem. op.). "[L]ooking at the evidence in the light most favorable to

the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

To challenge factual sufficiency in the same circumstances, the appellant must show "that the adverse finding is against the great weight and preponderance of the evidence." *V.T.*, 575 S.W.3d at 925 (quoting *Dow Chem.*, 46 S.W.3d at 242). For factual sufficiency, we consider all the evidence, both for and against the finding under attack. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Godfrey*, 2008 WL 3166328, at *1. We may set aside the finding "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem.*, 46 S.W.3d at 242.

A finding of family violence is necessary for a Family Code protective order. *See* Tex. Fam. Code §§ 81.001, 85.001. "Family violence" for these purposes includes:

> (1) an act by a member of a family or household against another member of the family or household . . . that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself; [or]
>
> (2) abuse, as that term is defined by Section[] 261.001(1)(C) . . . by a member of a family or household toward a child of the family or household.

*Id.* § 71.004(1)–(2). The portion of Section 261.001 relevant here regarding "abuse" is that the term includes

> physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident or

7

reasonable discipline by a parent, guardian, or managing or possessory conservator that does not expose the child to a substantial risk of harm.

*Id.* § 261.001(1)(C).

Robert's arguments on appeal advance three components of the "family violence" definition. He argues that the evidence was legally and factually insufficient for the trial court to have found against his position that Bell's actions (1) amounted to a threat that reasonably placed Daughter in fear of imminent physical harm, *see id.* § 71.004(1); (2) caused physical injury that resulted in substantial harm to Daughter, *see id.* §§ 71.004(2), 261.001(1)(C); and (3) amounted to a genuine threat of substantial harm from physical injury to Daughter, *see id.* §§ 71.004(2), 261.001(1)(C). But in each case, as to legal sufficiency, the record contains evidence supporting findings against Robert's position. *See Dow Chem.*, 46 S.W.3d at 241.

First, Misti's and Bell's testimony, when viewed in the light most favorable to the trial court's ruling, supplied evidence from which the trial court could reasonably have inferred that neither Bell's act of restraining Daughter nor her fall were acts that reasonably placed her in fear of imminent physical harm. *See* Tex. Fam. Code § 71.004(1). Misti testified that Daughter sparked the incident in the home by "bow[ing] up" and getting in Misti's face and yelling. Misti also testified that this behavior evoked Daughter's prior attack on Misti, when Daughter hit Misti multiple times after being made to break up with her boyfriend. Bell, Misti testified, had witnessed both that attack and a physical attack by Son against Misti, so the couple implemented what they called their safety plan. Per their plan, if either child was going to attack Misti again, Bell would restrain the child by putting his arms around their body and would physically remove the child

8

from the situation to deescalate it.[3] Misti testified that she and Bell had discussed this plan with Robert and that he did not object. And she emphasized that during her four years together with Bell, he has never been violent or threatened violence toward the children.

Bell's testimony was consistent with Misti's about the incident, about his witnessing the prior attacks on Misti, and about the couple's safety plan, and he added that removing Daughter from a tense situation helps her calm down. During the incident, Daughter's behavior, yelling, and physical "bowing up" led him to believe that she would imminently attack Misti. He testified that he therefore decided to act and "wrap[ped his] arms around her from behind and tr[ied] and g[o]t her to her room" and that he did this to deescalate the situation and defend both Misti and Daughter. He testified that he did not drag her but grabbed her from behind with his forearms across her at about shoulder height.

Bell's and Misti's testimony allowed the trial court to reasonably infer that restraining Daughter was not a threat that reasonably placed her in fear of imminent physical harm but was instead a deescalation lacking any threat of physical harm.

Similarly, their testimony allowed the trial court to reasonably infer that Bell's behavior during the immediate lead-up to the injury to Daughter's arm presented no such threat either. Misti and Bell both testified that Daughter squirmed to escape or otherwise tried to resist restraint. Misti testified that Daughter "pulled herself . . . out of his arms and fell to the floor" and then "turned around and looked at" Misti, who helped Daughter up, and Daughter, crying, said that Bell cannot yell at her friends. Bell, for his part, did not know how Daughter escaped his arms. But he denied throwing her and testified that his arm injury would have kept him from even

---

[3] Both Misti and Bell denied that the safety plan was an act of child discipline.

9

being able to. Right after Daughter's fall, Bell testified, Misti saw Daughter on the floor and simply told her to go to her room, which she did without making any accusation against Bell. Misti testified that the only thing that appeared on Daughter's arm at any time while she was still at Misti's home was "about a quarter, half-dollar size red mark on the inside of her elbow," so Misti gave her an ice pack, and she took a nap for two to three hours. Bell's view is that Daughter caused the bruising on her arm by sticking her arm out while he was carrying her down the hallway and that that act by her is what freed her from his arms.

The evening proceeded calmly, Misti explained—she woke Daughter to ask if she wanted to eat dinner, and later Misti, Daughter, and Bell spoke for about an hour about Daughter's behavior and choice of friends. All the while, according to Misti, Daughter "never said anything about" her arm, instead simply asking how she could get her phone back and complaining about how Bell yelled at her friends and boyfriend.

Misti's and Bell's testimony allowed the trial court to reasonably infer that Daughter's fall and related arm injury did not amount to a threat that reasonably placed her in fear of imminent physical harm. Because there is some evidence to support a finding that Bell's actions did not constitute a threat that reasonably placed Daughter in fear of imminent physical harm, the evidence was legally sufficient to support the finding, and we need not go on to consider Robert's evidence in terms of the legal-sufficiency challenge. *See Dow Chem. Co.*, 46 S.W.3d at 241.

We next consider legal sufficiency regarding a finding that Bell's actions did not cause physical injury that resulted in substantial harm to Daughter. *See* Tex. Fam. Code §§ 71.004(2), 261.001(1)(C). The testimony recounted above allowed the trial court to reasonably infer that Bell did not himself cause any physical injury resulting in substantial harm to Daughter. It allowed the trial court to reasonably infer that any injury to Daughter was caused by her

10

removing herself from Bell's arms and that it was her removal, not his actions, that caused her fall and ensuing arm injury.

Finally under legal sufficiency is a finding that Bell's actions did not constitute a genuine threat of substantial harm from physical injury to Daughter. *See id.* §§ 71.004(2), 261.001(1)(C). For the same reasons that we concluded above that the evidence was legally sufficient for the trial court to find that Bell's actions did not amount to a threat that reasonably placed Daughter in fear of imminent physical harm, we disagree with Robert on this item as well. In all, we overrule the legal-sufficiency portion of Robert's merits appellate issue.

What remains of that issue is his challenge to the factual sufficiency of the evidence under each of the same three components of the "family violence" definition. When considering factual sufficiency, we add to our consideration the evidence contrary to the challenged finding. *See Cain*, 709 S.W.2d at 176; *Godfrey*, 2008 WL 3166328, at *1. Here, that evidence comes in the form of Robert's testimony and the guardian *ad litem*'s testimony. Their understanding about the incident, insofar as their understanding diverges from that of Misti and Bell, came solely from Daughter, the only other witness to the incident. The trial court found that Daughter's "statements regarding the alleged assault on July 2, 2023, as such statements were admitted into the record, were inconsistent, not trustworthy, and self-contradicted by" Daughter. This finding goes to the credibility of Robert's and the guardian *ad litem*'s testimony, for if Daughter's reports of the incident were not credible, then those two witnesses' reports of the incident could not be credible either, grounded as they were in Daughter's reports. And there was evidence in the record to support this credibility finding. The admitted exhibit of the recording of the anonymous caller—Robert's erstwhile girlfriend—included the caller's statements that Daughter is "playing a game" and "playing the dad to get what [she] want[s]" including by being dishonest about Bell and what

11

he did during the incident and that Daughter has divulged this dishonesty to others.[4] Because we may not second-guess the trial court's credibility assessment, and in light of the evidence allowing the court to reasonably infer that Daughter was not credible and that neither Robert nor the guardian *ad litem* knew any more about the incident than what Daughter, Misti, or Bell had told them, we conclude that the evidence supporting the findings against Robert's position under the three components of the "family violence" definition at issue was not so weak, nor was the finding itself so against the great weight and preponderance of the evidence, as to be clearly wrong and unjust. *See Dow Chem.*, 46 S.W.3d at 242. We thus overrule the rest of Robert's issue.

## CONCLUSION

We affirm the trial court's judgment denying the protective-order application.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   August 29, 2025

---

[4] Also in the evidence, both Robert and the guardian *ad litem* testified that Daughter has shown at least an occasional tendency not to tell the truth. As to the exhibit of the recording, the trial court admitted it after lengthy argument from the parties about a hearsay objection to the exhibit, but on appeal, there is no assignment of error concerning the admission of the recording.